UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TONI L. MARTISE,                      )
                                      )
          Plaintiff,                  )
                                      )        No. 4:08CV01380 CAS/FRB
                                      )
     v.                               )
                                      )
                                      )
MICHAEL J. ASTRUE, Commissioner       )
of Social Security,                   )
                                      )
          Defendant.                  )


**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**


          This matter is on appeal for review of an adverse ruling
by the Social Security Administration.  All pretrial matters were
referred to the undersigned United States Magistrate Judge,
pursuant to 28 U.S.C. § 636(b), for appropriate disposition.

**I.   Procedural Background**

          On October 25, 2005, plaintiff Toni L. Martise
("plaintiff") applied for Disability Insurance Benefits ("DIB"),
alleging disability as of December 2003 due to "brain damage from
accident many years ago, anxiety, depression, memory problems, back
pain, asthma, arm weakness, migraine headaches, shoulder pain."
(Administrative Transcript ("Tr.") at 103-06).  Plaintiff's
application was initially denied, and she requested a hearing
before an administrative law judge ("ALJ").  (Tr. 58; 71-75; 78).

On May 15, 2007, a hearing was held before ALJ Randolph E. Schum in Creve Coeur, Missouri. (Tr. 25-57; 83-86). On July 21, 2007, ALJ Schum issued his decision denying plaintiff's application. (Tr. 7-22).

Plaintiff subsequently filed a Request for Review of Hearing Decision with defendant agency's Appeals Council, which denied plaintiff's request for review on August 15, 2008. (Tr. 1-6). The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. **Evidence Before the ALJ**

### A. Plaintiff's Testimony

During the administrative hearing, plaintiff was represented by attorney Nancy Mogab. When questioned by the ALJ, Plaintiff testified that she was 43 years old, and that she had graduated from high school. (Tr. 28). She testified that she had previously worked as a mail clerk for eight to ten years. (Id.) Plaintiff testified that this job required her to receive the mail from the mailman, and sort and deliver the mail to each recipient. (Tr. 52-53). Plaintiff testified that she did this by matching the name on the envelope with the names indicated in her mail cart, and then delivered the mail around the office. (Id.) She testified that she also sorted boxes delivered by UPS. (Tr. 54). She did not put on postage, or wait on people. (Tr. 52).

Plaintiff testified that she did not work from 1988 to

1995 because she was "having babies." (Tr. 29). Plaintiff testified that she has five children, ranging in age from 25 to 5 years. (Id.) She testified that her eldest child was mentally retarded, and that three of her other children had disabilities. (Tr. 29-30).

Plaintiff testified that she had seen Dr. David Berland for migraine headaches and mental issues, and because she was having difficulty dealing with her disabled children and the "outside world," and stated that she was "trying to tell people that I need help and try to let everybody understand that I have my disability and explain to them and it's real hard for people to look at me and see me looking normal; and for them to understand that I'm slow and it just all became too much." (Tr. 30). Plaintiff was unable to specify how many times she saw Dr. Berland, or the dates of her treatment. (Id). Plaintiff testified that Dr. Berland saw her and her children together for group sessions. (Tr. 31).

Plaintiff testified that she suffered from migraine headaches "every day," and that her medication did not help. (Id). She testified that she had trouble with asthma, and had breathing problems and coughing that cracked her ribs. (Id.) Plaintiff then testified that she now finally understood when to use her "breathing inhaler thing to try to stop my - - breaking my ribs." (Id.)

The ALJ asked plaintiff when she stopped working in the

mail room, and plaintiff replied that she did not work only in the mail room, but did several other jobs in the office. (Tr. 31-32). Plaintiff testified that she stopped doing this work because she "got hurt on my back and I ended up getting hurt on my elbows," and that her boss threatened to fire her if she could not keep doing her job, so she resigned. (Tr. 32). Plaintiff could not remember when she quit this job, or whether she collected unemployment after leaving. (Id.)

Plaintiff was then questioned by her attorney. Plaintiff testified that she was currently married to her second husband, and that the two of them lived with all of the children and with plaintiff's 19-year-old niece. (Tr. 32-33). Plaintiff testified that her niece helped her with the children. (Tr. 33). Plaintiff testified that she received special education services while in school, and believed that she read at a second or third-grade level. (Tr. 34). Plaintiff testified that she was able to do the mail room job because she matched the names on the mail with the names on the mail boxes. (Id.) Plaintiff testified that that she hurt her back when she had to lift heavy boxes while pregnant, stating that her employer made her lift boxes heavier than 25 pounds. (Id.) Plaintiff testified that she told her boss she was hurt, and her boss replied, "well, if you can't do your job, then we'll have to fire you," and plaintiff kept working. (Id). Subsequently, plaintiff was on bed rest until she had her baby, and returned to work. (Tr. 34-35). After returning to work, she

-4-

developed problems with her right and left arms. (Tr. 35).
Plaintiff testified that she had to carry heavy boxes for long
distances, even though her employer did not require any of the
other female employees to do so. (Id.) Plaintiff testified that
she began experiencing burning and shooting pain in her right arm
down into her hand, and sought treatment, and was later told she
would require surgery. (Id.) Plaintiff testified that she could
not afford the surgery, however, because she did not receive any
money from her divorce. (Tr. 35).

Regarding her left arm, plaintiff testified that, because
she was told not to use her right arm, she overused her left. (Tr.
36). Specifically, plaintiff stated: "I started using my left
hand, which I'm not left-handed. So then I had to lift up these
big boxes. So I started using my left foot and my left arm, trying
to wrap it around it and lift it up so I could grab it and then try
to put it on my hip so I could carry it through the building and
then that's how I ended up hurting my left elbow and hurting my
shoulder." (Id.) Plaintiff reiterated that her boss threatened to
fire her if she did not do her work. (Id.)

Plaintiff testified that she had surgery on her right
elbow, but could not remember the year or the doctor's name. (Tr.
36-37). Plaintiff testified that she still has burning in her
right elbow if she tries to lift her son, and stated that she could
lift five pounds without symptoms. (Tr. 37). Plaintiff testified
that she experienced burning in her right elbow that lasted for "a

day or two," and that she used a brace on her right arm. (Tr. 37-38). Plaintiff testified that the burning sensation went from her elbow to her ring and little fingers, but denied numbness or tingling, and also denied having trouble holding on to objects. (Tr. 38-39). She testified that she wears slip-on shoes, and shirts without buttons, and also stated that, when she had problems, she used her brace once or twice a month, for a period of about a day or two. (Tr. 39-40). Plaintiff also testified that she performed exercises. (Tr. 39). Plaintiff testified that, if she "picked something up [she's] not supposed to," she would have burning pain that lasted for a couple of days. (Tr. 40).

Plaintiff testified that her left upper extremity was worse than her right. (Tr. 41). She denied having surgery, but stated that she was told she needed surgery and that surgery would be performed, but it was not performed due to a paperwork error. (Id.) Plaintiff testified that she experienced constant burning pain, numbness and tingling in her left arm that radiated into her ring and little finger, and had reduced grip strength. (Tr. 41). She testified that she avoided picking up things with her left hand because it affected her elbow and shoulder, and testified that she could not raise her left arm above shoulder level due to pain and a popping sensation. (Id.)

Regarding her back, plaintiff testified as follows: "If I turn a wrong way, I get this bad pain in my lower back and then it shoots down my right leg and then I start crying and then I'm in

bed for almost two weeks and then I have my niece help me out to go to the bathroom and then help me in the shower and then she has to help me and then she has to help me get out and she has to stay in there because the pain sometimes gets so severe that one time I fell in the bathtub." (Tr. 42). Plaintiff's attorney asked plaintiff how often she experienced that type of back pain, and plaintiff initially indicated trouble remembering, but later stated that it occurred once every two months. (Id.) Plaintiff testified that her condition was helped by lying in bed and by doing doctor-recommended exercises. (Tr. 43).

Plaintiff testified that she did not take prescription pain medication for her back or for her arms, but instead took Advil. (Tr. 43-44).

Plaintiff testified that she took medication to both prevent and relieve migraines.[1] Plaintiff described seeing objects and auras, and experiencing light sensitivity, along with head pain. (Tr. 45-46). Plaintiff testified that, in addition to taking mediation, she confined herself to a dark room, and applied ice to her neck and temples. (Tr. 46). Plaintiff testified that medication relieved her symptoms for about two hours, but she would then "get hit with another bad one." (Id.) Plaintiff testified

---

[1]One of the medications specified during this testimony was Amitriptyline. Amitriptyline, also known as Elavil, is used to treat symptoms of depression. It is in a class of medications called tricyclic antidepressants. It works by increasing the amounts of certain natural substances in the brain that are needed to maintain mental balance. http://www.nlm.nih.gov/medlineplus/druginfo /medmaster/a682388.html

that she had three to four migraines per day.  (Tr. 47).

Plaintiff's attorney asked her how she spent her day, and plaintiff replied that she had awakened early that morning, but went back to sleep, and then rose later to get her son to school. (Tr. 47).  Plaintiff testified that her niece fed and dressed her (plaintiff's) youngest child.  (<u>Id.</u>)  She testified that she tries to avoid driving, and stated, "I just want to stay in my room and I just want everybody to leave me alone."  (<u>Id.</u>)  She denied cooking or cleaning, stating that she has not done household duties since she stopped working in early 2004.  (Tr. 48).  Plaintiff described her mental state as "worse than a depression."  She stated that she often cried and felt lonely, and felt like everyone wanted to judge her, and stated that she was "tired of trying to be normal."  (<u>Id.</u>)  She stated that she did not get dressed every day. (<u>Id.</u>)

Plaintiff testified that she was recently diagnosed with diverticulitis,[2] and that she had pain and bleeding associated with it.  (Tr. 49).  She testified that she had trouble with asthma and needed breathing treatments once or twice per week.  (<u>Id.</u>)  She stated that she had difficulty concentrating, and that she could not read.  (<u>Id.</u>)  Plaintiff testified that her niece turned her

---

[2]Diverticulitis is swelling (inflammation) of an abnormal pouch (diverticulum) in the intestinal wall. These pouches are usually found in the large intestine (colon). The presence of the pouches themselves is called diverticulosis.
http://www.nlm.nih.gov/medlineplus/ency/article/000257.htm

television on for her and urged her to watch, but that plaintiff turned it off when her niece left the room. (Id.) Plaintiff testified that she had trouble sleeping, and explained that she remained awake until two or three in the morning, just staring at the clock. (Tr. 49-50).

Plaintiff testified that, when she graduated from high school, her mother took her to MERS/Goodwill for evaluation, and was told that the results indicated that she fell in the "high retardation" range. (Tr. 51). Plaintiff testified that she had trouble with "everything," and stated that she "just chose to fight [her] way to try to be normal all [her] life." (Id.) She testified that she had trouble understanding simple instructions. (Id).

The ALJ then heard testimony from Dr. Jeff Magrowski, a vocational expert ("VE"). The ALJ asked Dr. Magrowski to assume a hypothetical claimant of plaintiff's age and education, who can understand, remember and carry out at least simple instructions and non-detailed tasks, and can perform work in a low-stress environment without public contact. (Tr. 54). Dr. Magrowski testified that such a person could not return to the work plaintiff testified to, but could work as a mail clerk, a "light" job with 2,500 jobs available in the state economy, and 10,000 available in the national economy. (Id.) Dr. Magrowski testified that plaintiff's former job differed from this "mail clerk" job, inasmuch as plaintiff's former job required her to deliver mail and

lift large packages in excess of 20 pounds. (Tr. 55). The ALJ
stated that there was no weight limit in the hypothetical, and
asked what it was about plaintiff's past relevant work that
differed from the "mail clerk" job Dr. Magrowski noted. (Id.) Dr.
Magrowski testified that plaintiff's former work seemed more
complex, because plaintiff had to perform activities other than
sorting mail. (Id.) Dr. Magrowski also testified that plaintiff
could perform work as a laundry bagger (1,000 locally and over
100,000 nationally). (Id.) Dr. Magrowski testified that this job
had a Specific Vocational Preparation ("SVP") of one.[3] (Tr. 55).

    The ALJ then asked Dr. Magrowski to review the residual
functional capacity ("RFC") assessment of Dr. Berland, and opine
whether a person with that RFC could perform any past relevant
work. (Id.) Dr. Magrowski testified that a person with that RFC
could not perform any of plaintiff's past relevant work, and could
not perform any work in the state or national economy. (Tr. 56).
At the conclusion of the hearing, the administrative record was
closed. (Tr. 57).

---

[3]"SVP" refers to the amount of time it generally takes to learn a job. See
United States Dep't of Labor, Employment and Training Admin., Dictionary of
Occupational Titles ("DOT"), Vol. II, Appendix C at 1009. An SVP level of "three"
indicates that a job requires more than one month and up to three months of
training; while an SVP level of "four" would require more than three months and
up to six months of training. See Id. at 1009. Unskilled work, on the other hand,
requires less than thirty days training. 20 C.F.R. § 404.1569(a); 20 C.F.R. Pt.
404, Subpt. P, App. 2 § 201.00. Unskilled work corresponds to an SVP of one or
two in the DOT. See DOT at 1009.

B.  <u>Medical Records</u>[4]

Records from the Family Practice of South County, the office of Helene Aisenstat, M.D. and Robert A. Aisenstat, M.D., indicate that plaintiff was seen from May 26, 1994 through May 21, 2003 with complaints of migraine headaches, asthma, sinusitis, nasal congestion, coughing, ear pain, left shoulder pain, trouble sleeping, feelings of hopelessness and helplessness, depression, and family distress.[5]  (Tr. 192-2).  On June 1, 1995, plaintiff's husband called Dr. Aisenstat to report that plaintiff was behaving in an aggressive manner, was packing her clothes to leave, and was drinking alcohol.  (Tr. 264).  On December 29, 1997, a chest x-ray was negative.  (Tr. 310).  On June 1, 1998, plaintiff reported that Imitrex[6] injections helped her migraines.  (Tr. 323).  On July 10, 1998, plaintiff reported that, for the preceding two days, she had been unable to stop coughing, and had decreased respiratory effort with wheezing.  (Tr. 327).  She was diagnosed with asthma and bronchitis.  (<u>Id.</u>)  On September 3, 1998, plaintiff complained of severe pain in her rib cage, but an x-ray of plaintiff's ribs was negative.  (Tr. 331-32).  On August 12, 1999, plaintiff reported that she had started wrestling; that she planned to wrestle

_____

[4]The administrative transcript includes medical records pre-dating plaintiff's alleged date of onset.  These records will be included in the following summary of the medical information.

[5]Plaintiff was normally seen by Dr. Helene Aisenstat.

[6]Imitrex, or Sumatriptan, is used to treat the symptoms of migraine headaches.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a696023.html

professionally; and that she had been wrestling at a gym with no problems. (Tr. 357). On May 30, 2000, plaintiff reported that her depression was "out of control." (Tr. 371).

Records from Missouri Baptist Medical Center indicate that plaintiff presented on May 25, 2001 with complaints of low back pain.[7] (Tr. 248, 663-65, 676-77). An MRI confirmed a herniated disk at L4-5. (Tr. 448, 475, 675). Plaintiff, who at the time was in the fourth month of a pregnancy, was admitted, and orthopedic consultation was sought. (Tr. 448, 456-57). Plaintiff was treated by John Graham, M.D., James Burke, M.D., and Ivan Myers, M.D., and improved after bed rest and epidural steroid injections. (Tr. 249, 251, 448, 478, 678). She was discharged on June 2, 2001. (Tr. 448). On June 18, 2001, plaintiff saw John Graham, M.D., and reported improvement in her back pain, and plaintiff was advised to take Tylenol #3[8] for any extreme pain. (Tr. 242-43).

On September 27, 2002, plaintiff saw Dr. Aisenstat and reported that she had been coughing so much that she feared she fractured a rib, (Tr. 417), and was diagnosed with a rib fracture in the back of her ribcage. (Tr. 419).

On January 21, 2004, plaintiff was seen by David M.

---

[7]In these medical records, plaintiff's former surname "Crecelius" is used.

[8]Tylenol 3 is a combination of acetaminophen and codeine, and is used to relieve mild to moderate pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681004.html

Brown, M.D., with complaints related to right lateral epicondylitis (also known as "tennis elbow."). (Tr. 634, 642). It appears that plaintiff's employer, International Foods, sent her to Dr. Brown in conjunction with a work-related injury. See (Tr. 633). Dr. Brown noted that plaintiff had been seen for this condition in October of 2000, and that she had responded to a course of conservative treatment, but that she experienced an exacerbation on December 31, 2003, when she was "pushing a banker box weight about 50 or 60" pounds. (Tr. 633-34, 639, 642). Plaintiff reported that she was a smoker, and that she had lung trouble. (Id.)

Upon examination, plaintiff was tender over the right elbow, but there was no swelling. (Tr. 634, 642). She complained of increased pain with resisted wrist extension. (Id.) X-rays performed on January 5, 2004 revealed no significant bone or joint abnormality. (Id.) Dr. Brown diagnosed plaintiff with chronic right lateral epicondylitis and performed a steroid injection; recommended that plaintiff wear a forearm brace and use a non-steroidal anti-inflammatory medication; and return for follow-up in four weeks. (Tr. 634-35, 642-43).

On January 29, 2004, plaintiff saw Dr. Aisenstat with complaints of pain in her left elbow, wrist, and shoulder. (Tr. 190-91). Plaintiff was diagnosed with insomnia, depression, headache, and left upper extremity pain, and advised to return in three months. (Tr. 191).

On February 16, 2004, plaintiff returned to Dr. Brown and

reported no improvement in her right elbow pain. (Tr. 632). Upon exam, plaintiff had good active range of motion, but was tender over the right elbow, and reported pain with wrist extension. (Id.) Dr. Brown recommended surgical intervention, and opined that plaintiff could work with a five-pound lifting limit and with no sustained repetitive activities preceding surgery. (Tr. 630, 632).

On February 18, 2004, plaintiff returned to Dr. Brown and stated that she could not work. (Tr. 628). She complained of burning pain in her right elbow with shooting pain into her hand, and stated that she could not even brush her teeth with her right arm. (Id.) Plaintiff also reported having pain in her left elbow, shoulder and neck which also began in December of 2003. (Id.) Plaintiff reported being unable to go to the grocery store, clean her house or do dishes because of her pain. (Id.) Dr. Brown noted that he had received a facsimile from Amerisure Insurance Company, the workers' compensation insurance carrier for plaintiff's employer, listing various jobs that were available for plaintiff. (Tr. 628). The first was "answering phones and taking messages approximately 20 calls per hour," but Dr. Brown noted that plaintiff said she could not do that work "because of some brain trauma she has had in the past and she cannot write messages." (Id.) The second job was described as "occasional signing of packages," but Dr. Brown noted that plaintiff said she could not do this either. (Id.) Other jobs that were noted included "loading the fax machine with paper no more than 3/4 inch deep," "separating

-14-

perforating green bar computer paper and placing these in a pile,"
and her normal job duties, which included sorting, delivering mail,
collecting and processing mail, and other activities. (Tr. 628-
29). Plaintiff stated that she could not perform any of these
activities without pain. (Id.) Plaintiff did report that she
could remove faxes from the fax machine and call the recipients to
alert them that a fax was waiting. (Tr. 628).

Dr. Brown noted that plaintiff was tearful. (Tr. 629).
Dr. Brown noted no visible swelling, abnormality, or sympathetic
changes in either extremity. (Id.) On the right, plaintiff had
diffuse tenderness from the right elbow into the distal forearm,
and Dr. Brown noted that her subjective complaints had expanded in
scope. (Id.) Dr. Brown noted that plaintiff had no specific
Tinel's sign over the ulnar or median nerve at the wrist, and that
direct compression testing, elbow flexion testing, and Phalen's
testing were all negative. (Id.) Plaintiff demonstrated full
fluid active range of motion of the right elbow, wrist, and
fingers. (Tr. 629). Dr. Brown noted that, on the left, plaintiff
had diffuse tenderness from the shoulder to the elbow, and testing
for cubital tunnel syndrome and carpal tunnel syndrome were
negative. (Id.) Plaintiff had good sensation and perfusion to the
digits of the hand, and Dr. Brown could detect no intrinsic muscle
atrophy. (Id.) Dr. Brown noted that, when he asked plaintiff to
give maximal effort, she was unable to record any measurable grip
strength. (Id.) Dr. Brown also noted that plaintiff demonstrated

co-contracting when she was doing her grip strength testing. (Tr. 629).

Dr. Brown wrote as follows:

[Plaintiff's] subjective complaints have expanded, are diffuse and are non-physiologic and do not correspond to any specific upper extremity diagnosis. What started out as pain fairly well localized to the right lateral elbow consistent with lateral epicondylitis has now expanded to diffuse bilateral upper extremity pain. She does demonstrate evidence of symptoms magnification and poor effort on examination. I explained to [plaintiff] at this point, I would advise against surgical intervention since her symptoms are so diffuse and severe. I recommend she obtain a second opinion to see if there is anything else that can be done to help her, but at this point, I would advise against surgical intervention. With regards to her ability to work, at this point, I allow her to work as tolerated. She seemed agreeable to this. I recommend she work as tolerated until she obtains her second opinion.[9]

(Id.)

On February 19, 2004, plaintiff saw Dr. Aisenstat for a "check up on medications" and follow-up for headache. (Tr. 161). Dr. Aisenstat noted that plaintiff had been seen by a workman's compensation doctor (Dr. Brown). (Id.) Dr. Aisenstat noted that plaintiff reported that "Diane," a human resources employee at plaintiff's work, told plaintiff that she did not care what plaintiff's primary care doctor said, and plaintiff retained a

---

[9]There is no indication in the record that plaintiff ever obtained this second opinion.

lawyer. (Id.) Dr. Aisenstat then notes Dr. Brown's opinion regarding obtaining a second opinion regarding plaintiff's upper extremities, and also noted that plaintiff said she could not answer the phone because she had problems with spelling, and could not even pick up a phone. (Tr. 161-62). Plaintiff reported that her migraines were "getting out of control." (Tr. 162). Physical examination was normal. (Id.)

On May 4, 2004, plaintiff complained of sinus trouble and migraine headaches, with no shortness of breath. (Tr. 160). Examination was normal, with no rales, wheezing or rhonchi. (Id).

On June 24, 2004, Dr. Brown performed a right epicondylectomy. (Tr. 620-21, 626-27). Plaintiff returned to Dr. Brown on August 3, 2004 for a scheduled follow-up, and reported that she was "doing great." (Tr. 625). She had active range of motion of the elbow, with no tenderness or pain, and grip strengths of 55 pounds on the right and 75 pounds on the left. (Id.) She was advised to continue her home therapy program, and work on full duty with no restrictions, and return in two months. (Id.) Plaintiff returned on October 4, 2004, and reported that her right elbow was much improved. (Tr. 623). Examination was normal, with no tenderness or pain, and good active range of motion. (Id.) Dr. Brown opined that no further care was necessary, and that plaintiff

could work with no restrictions.[10]  (Id.)

On August 11, 2004, plaintiff presented to Dr. Aisenstat and stated that she wanted medication to aid weight loss.  (Tr. 189).  It was noted that plaintiff was using an inhaler.  (Id.) Plaintiff denied tobacco use.  (Id.)  Physical examination was negative.  (Id.)  Plaintiff was given Albuterol,[11] Neurontin,[12] Esgic,[13] Trazodone,[14] Advair[15] and Effexor,[16] and advised to return to the clinic as needed.  (Tr. 190).  On October 14, 2004, plaintiff called Dr. Aisenstat's office from California, and reported that she had been having anxiety attacks, and wanted a prescription for

_____

[10]The record indicates that plaintiff settled her workers' compensation claim for injuries to her right and left upper extremities for five percent of the left arm at the shoulder, and fifteen percent of her right elbow.  (Tr. 65-69).

[11]Albuterol is a bronchodilator used to prevent and treat wheezing, difficulty breathing and chest tightness caused by lung diseases such as asthma and chronic obstructive pulmonary disease (COPD; a group of diseases that affect t h e   l u n g s   a n d   a i r w a y s ) . http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a607004.html

[12]Neurontin, also known as Gabapentin is used to help control certain types of seizures in patients who have epilepsy. Gabapentin is also used to relieve the pain of postherpetic neuralgia (PHN; the burning, stabbing pain or aches that may last for months or years after an attack of shingles). http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html

[13]Esgic is a combination of acetaminophen, butalbital, and caffeine, and is used to relieve tension headaches.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601009.html

[14]Trazodone is used to treat depression.  http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681038.html

[15]Advair is a combination of fluticasone and salmeterol, and is used to prevent wheezing, shortness of breath, and breathing difficulties caused by asthma and COPD.  http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a699063.html

[16]Effexor, or Venlafaxine, is used to treat depression.  http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a694020.html

Xanax.

On February 7, 2005, plaintiff presented to Dr. Aisenstat with complaints of nasal congestion and cough, headache, sinus pressure, ear pain, shortness of breath, and wheezing, and reported that she was taking over-the-counter medication with little relief. (Tr. 158). Examination was normal. (Id.) Plaintiff was assessed with bronchitis, sinusitis, allergies, and asthma, and advised to use steam treatments, and take Tylenol or Ibuprofen as needed. (Tr. 159). Plaintiff was also advised to stop smoking. (Id.)

On March 7, 2005, plaintiff saw Dr. Aisenstat and reported having anxiety attacks, and problems with her children, inasmuch as her son had attacked her, and her other children were having problems as well. (Tr. 158). Physical examination was normal. (Id.) Plaintiff was given Toradol, and referred to Dr. David Berland. (Id.)

On March 9, 2005, plaintiff saw David Berland, M.D., for psychiatric evaluation. (Tr. 227-29; 597-99). Plaintiff reported that she lived with her husband and children, and that all of her children were either physically or mentally ill. (Tr. 227, 597). Plaintiff reported that her 23-year-old son was mentally retarded and had birth defects; her sixteen-year-old son had been hospitalized at a state psychiatric hospital; her fourteen-year-old son had recently been discharged from an adolescent psychiatric unit; and her thirteen-year-old daughter had an unknown prognosis due to an illness. (Id.) Plaintiff reported being under extreme

-19-

stress for the past ten days. (Id.) She reported that she was involved a serious motor vehicle accident twenty years ago which caused her to have reading, writing, and spelling disabilities, as well as an "anesthetized lower lip." (Id.) Plaintiff reported that, on February 28, 2005, her sixteen-year-old son attempted to choke her, and the police were called and transported the son to the state psychiatric hospital. (Tr. 227, 597). The next day, presumably another son ran away from school, and the police were called for him and also took him to the psychiatric hospital. (Id.) Plaintiff also reported that she had recently been told that her daughter had a life-threatening illness, and that there was no definite prognosis. (Id.) Plaintiff reported that she was currently taking Effexor, Trazodone, Neurontin, and Alprazelam.[17]

Plaintiff reported several mental health disorders in her immediate family. She reported that her eldest brother had violent outbursts; that her mother had obsessive-compulsive disorder; and her aunt was phobic. (Id.) Plaintiff reported that the aunt also had a grandson who had been diagnosed with bipolar disorder and schizophrenia. (Tr. 227, 597). Plaintiff reported that her father had alcohol problems, and also that, during her divorce, police were involved, inasmuch as plaintiff "hot-lined" her son's father for possible abuse. (Tr. 227-28, 597-98). Plaintiff reported

---

[17]Alprazelam, also known as Xanax, or Alprazolam, is used to treat anxiety disorders and panic attacks. http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a684001.html

increasingly severe migraines, and elevated blood pressure. (Tr. 228, 598). Plaintiff reported that her mother told her that she was always a good student. (Id.) Plaintiff stated that the aforementioned car accident was a "life altering event" that caused learning and memory problems. (Id.) Plaintiff reported that she had her first child while a sophomore in high school; married her first husband in 1987; and worked providing child care in her home. (Id.) She reported working for "a large corporation," but stated that the work involved repetitive motion, and she resigned in 2003. (Tr. 228, 598).

Plaintiff testified that she took her younger daughter to California "in order for her to reach a dream," and "commuted a couple of times" before bringing the daughter back to St. Louis in May. (Id.) She traveled again with her daughter in August, and returned to St. Louis in mid November, 2004. (Id.) Plaintiff reported experiencing a panic attack "over the weekend," and called the office of Dr. Aisenstat, who referred plaintiff to Dr. Berland. (Id.)

Plaintiff stated that she had no time to pursue any of her own interests, and that she would like to be able to swim and exercise. (Tr. 229, 599). She reported feeling hopeless and experiencing crying spells, stating that she was worried about whether any of her children would ever be able to live independently. (Id.) Dr. Berland noted that plaintiff was oriented, but could not name the current or past presidents, and

required a prompt to recall four out of four items after five minutes. (Id.) Plaintiff could perform serial threes from twenty without error; could spell "world" correctly backward and forward; and exhibited concrete thinking. (Id.)

Dr. Berland opined that plaintiff had adjustment disorder with a depressed mood, and possible major depression/post-traumatic stress disorder/stress reaction. (Tr. 229, 599). He noted that plaintiff had reading, writing and spelling difficulties, and extreme family problems. (Id.) He assessed a Global Assessment of Functioning ("GAF") score of 45.[18] (Id.) Dr. Berland decreased plaintiff's Effexor to reduce her hypertension, and prescribed Klonopin.[19] (Id.)

On March 31, 2005, plaintiff saw Dr. Aisenstat in follow-up after having passed a kidney stone. (Tr. 187). Physical examination was normal, and plaintiff was given Flexeril[20] and told to follow up in three months. (Tr. 188).

Plaintiff returned to Dr. Berland on April 7, 2005, and reported that she was scheduled for a colonoscopy. (Tr. 592). She reported that her migraines were under better control, but that her

_____

[18]A GAF of 41 to 50 indicates the individual has "[s]erious symptoms ... or any serious impairment in social, occupational, or school functioning...." . See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 4th Edition (DSM-IV-TR), 32 (2000).

[19]Klonopin, or Clonazepam, is used to control seizures. It is also used to control anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html

[20]Flexeril, or Cyclobenzaprine, is a muscle relaxant used to relax muscles and relieve pain caused by strains, sprains, and other muscle injuries. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682514.html

family problems persisted. (<u>Id.</u>) On May 17, 2005, plaintiff reported that she experienced up to two migraines per day; argued with her husband; and cried. (Tr. 230, 591). Dr. Berland wrote "she's doing physical labor - per sister in law." (<u>Id.</u>) Dr. Berland recommended that plaintiff try Elavil (Amitriptyline). (<u>Id.</u>) On May 31, 2005, plaintiff reported that Elavil was helping with her migraines. (<u>Id.</u>)

On June 16, 2005, plaintiff saw Dr. Berland and reported that she had been to court, and reported that her former husband would not see her children. (Tr. 230, 590-91). She stated that she felt good, had no migraines, and that her energy was "ok." (Tr. 591).

On August 8, 2005, plaintiff saw Dr. Aisenstat and reported rectal bleeding. (Tr. 183). Plaintiff also reported an increase in stress and migraine headaches, and it was noted that she was taking asthma medication. (<u>Id.</u>) She denied tobacco use. (Tr. 184). She was given a physician referral, and advised to return to the clinic as needed. (<u>Id.</u>)

On August 25, 2005, plaintiff saw Dr. Aisenstat with pain in her right knee. (Tr. 154-55). Plaintiff reported a lot of stress due to many problems with her children. (Tr. 155). Plaintiff reported that her breathing was better and that she was using Albuterol, and planned to resume taking Advair. (<u>Id.</u>) Plaintiff was diagnosed with right knee strain, and a splint was recommended. (<u>Id.</u>)

On November 29, 2005, plaintiff saw Dr. Aisenstat with complaints of a cough and beginning to wheeze; a sore nose; and ear pain. (Tr. 154). Physical examination was normal. (<u>Id.</u>) Plaintiff was diagnosed with sinusitis, and a cough caused by an irritant, and was told to rest, take fluids, use pain relievers, and an antibiotic, and use Albuterol. (<u>Id.</u>)

Also on November 29, 2005, plaintiff saw Dr. Berland and reported that she had not been to see him recently because she did not have any money. (Tr. 231, 590). Plaintiff described being in a "black hole" and said she wanted a "tiny stroke" to wipe away emotion and the ability to know what's going on. (<u>Id.</u>) Plaintiff reported that she had to pay a $500.00 co-pay for her son's medication, and that she was $95,000.00 in debt. (<u>Id.</u>) Dr. Berland gave plaintiff samples of Zoloft.[21] (<u>Id.</u>)

Plaintiff returned to Dr. Berland on December 13, 2005 stating that she cried less, and no longer dwelled on wanting a stroke. (Tr. 231, 590). Dr. Berland gave plaintiff sample medication. (<u>Id.</u>)

Plaintiff saw Dr. Berland on January 24, 2006 and reported some improvement in mood, but continued to report major issues concerning her children. (Tr. 589). She reported that Topamax "really helps" with her migraines. (<u>Id.</u>)

---

[21]Zoloft, or Sertraline, is used to treat depression, anxiety, and other psychological disturbances. <u>http://www.nlm.nih.gov/medlineplus/druginfo/</u> medmaster/a697048.html

On February 7, 2006, James M. Spence, Ph.D., completed a Mental Residual Functional Capacity Assessment. (Tr. 581-83). No "marked" limitations were noted. See (Id.) "Moderate" limitations were noted in plaintiff's ability to understand, remember, and carry out simple instructions; sustain an ordinary routine without supervision; complete a normal work day and work week without interruptions from psychological symptoms; and get along with co-workers. (Tr. 581-82). In all other areas, no significant limitations were noted. See (Id.)

On this same date, Dr. Spence also completed a Psychiatric Review Technique form. (Tr. 567-80). Therein, Dr. Spence noted that plaintiff had organic mental disorders and anxiety-related disorders, and opined that plaintiff also had the medically determinable impairments of self-reported brain damage following a car accident with difficulties reading, writing and spelling, (Tr. 568), depression (Tr. 570), and anxiety. (Tr. 572). Dr. Spence found that plaintiff had "moderate" limitations in her abilities to maintain social functioning, concentration, persistence and pace; "mild" restrictions in her activities of daily living; and no limitations related to episodes of decompensation. (Tr. 577). Dr. Spence noted that he had reviewed Dr. Berland's records, and noted that plaintiff had many stressors in her life that aggravate her condition, and that she was not always consistent with obtaining treatment due to financial difficulties. (Tr. 579). Dr. Spence partially credited

plaintiff's report of her activities of daily living, noting that she made cereal and sandwiches for her son, and also made spaghetti and Hamburger Helper, spending five minutes to one hour on food preparation. (Id.) Dr. Spence noted that plaintiff slept, cried, and stayed in her room most of the time with the lights off. (Id.) Dr. Spence noted that the most recent medical evidence did not indicate that plaintiff's condition was as severe as she alleged, noting that she recently reported improvement, and that her conditions improved with medication. (Id.) Dr. Spence concluded that plaintiff's medical records demonstrated that, with medication and continued treatment, plaintiff could perform simple tasks on a sustained basis, but should work in a low-stress environment away from the public. (Tr. 579).

On April 24, 2006, plaintiff reported that one of the children had moved out, and that her marriage was good. (Id.) She reported taking Zoloft and Topomax, but not Elavil or Neurontin, and that her mood was "ok." (Id.) On October 6, 2006, Dr. Berland saw plaintiff's son, and noted a description of an incident involving plaintiff's daughter and another teenage girl who were fighting, apparently necessitating a restraining order. (Tr. 589).

On July 19, 2006, Dr. Aisenstat noted that plaintiff reported that Topamax was working, but that she was in Arkansas last week and ran out of Topamax, at which point the headaches returned. (Tr. 611). Dr. Aisenstat noted that plaintiff had been doing well on her medications, and that she needed refills. (Id.)

On November 30, 2006, plaintiff saw Dr. Berland and reported that her husband had quit his job, and planned to start a job as an over-the-road trucker. (Tr. 588). Plaintiff reported that her daughter was expelled from her second school due to a fight in which girls hit each other with bricks on plaintiff's front lawn. (Id.) It is indicated that plaintiff had quit smoking, but then resumed smoking due to family stress. (Id.) On February 20, 2007, plaintiff reported that her young daughter was involved with illegal drugs and other misbehavior, and plaintiff was tearful and reported that she was stressed. (Id.)

On March 15, 2007, plaintiff reported that her daughter was at Hawthorn, the state psychiatric hospital, and plaintiff reported experiencing a migraine headache, eye twitches, and shoulder spasm. (Tr. 588). Plaintiff's medications were adjusted. (Id.) On April 4, 2007, plaintiff reported that she was having a colonoscopy performed that Friday, and that she was losing blood and felt sleepy. (Tr. 586). Plaintiff reported that her daughter was due to be released from the psychiatric hospital. (Id.) On April 16, 2007, Dr. Berland noted that plaintiff's metabolic panel test and thyroid were normal, and that plaintiff was scheduled for a gastrointestinal follow-up appointment. Plaintiff exhibited no other complaints. (Id.)

On May 1, 2007, Dr. Berland completed a Mental Medical Source Statement ("MSS"). (Tr. 601-04). Dr. Berland noted "marked" restrictions in plaintiff's ability to maintain

-27-

reliability, attendance and punctuality; to complete a normal workday and work week; to maintain attention and concentration; and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 601-02). Dr. Berland opined that plaintiff had "moderate" restrictions in her ability to behave in an emotionally stable manner. (Tr. 601). Dr. Berland opined that plaintiff had "mild" restrictions in her ability to cope with normal work stress; function independently; accept instructions and respond to criticism; understand and remember simple instructions; make simple work-related decisions; sustain an ordinary routine; and respond to changes in a work setting. (Tr. 601-02). Dr. Berland opined that plaintiff had no limitations in her ability to relate in social situations; interact with the public; maintain socially acceptable behavior; and work in coordination with others. (Id.) Dr. Berland opined that plaintiff had not suffered from an episode of decompensation that lasted at least two weeks, and did not find that plaintiff had a substantial loss in the ability to stick to a task; understand, remember and carry out simple instructions; make work-related judgments/decisions; respond appropriately to criticism; or deal with changes in a work setting. (Tr. 603). Dr. Berland assessed a Global Assessment of Functioning ("GAF") score of 55.[22] (Tr. 604). Dr. Berland noted that

---

[22]A GAF score of 51 to 60 is consistent with moderate symptoms or moderate difficulty in social, occupational, or school functioning. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 4th Edition (DSM-IV-TR), 34 (2000).

plaintiff's lowest GAF in the preceding year had been 40. (<u>Id.</u>)

On May 15, 2007, the day of plaintiff's administrative hearing, ALJ Schum wrote to Dr. Berland, seeking clarification of the opinions he expressed in his May 1, 2007 MSS. (Tr. 618). In his letter, the ALJ advised Dr. Berland that his report contained the following deficiencies: (1) it contained conflicts that could not be reconciled with the medical evidence of record, including plaintiff's GAF score; (2) it did not contain all the necessary information needed to assess the severity of plaintiff's impairments; (3) it did not appear to be based upon medically acceptable clinical and laboratory diagnostic techniques; and (4) it did not adequately address what plaintiff could do despite her impairments. (<u>Id.</u>) The ALJ asked Dr. Berland to "provide medical records, a new report, or a more detailed report to support" the MSS. (<u>Id.</u>) In a letter dated May 17, 2007 and received by ALJ's Schum's office on May 18, 2007, Dr. Berland responded to the ALJ's inquiry as follows:

> Thank you for your careful reading of the material I sent regarding Ms. Martise and your request for further information.
>
> I have photo copied and sent all the information in my chart to Nancy Mogab of Mogab and Hughes. If you would like me to send a copy of that material directly to you, please let me know. I have no other documentation regarding Ms. Martise.

(Tr. 617).

At the conclusion of Dr. Berland's letter, it is

indicated that a carbon copy of it was forwarded to plaintiff's counsel. (Id.) It does not appear that the ALJ forwarded to plaintiff a copy of the letter he sent to Dr. Berland.

III.    **The ALJ's Decision**

The ALJ found that plaintiff had not met her burden of proving that she had not engaged in substantial gainful activity since December 31, 2003, the alleged onset date. (Tr. 12). In so finding, the ALJ noted that plaintiff had earnings of $4,026.96 posted to her earnings record in 2004, with no explanation of the source of such earnings. (Id). The ALJ stated that he would nevertheless proceed with the sequential analysis. (Id.)

The ALJ determined that plaintiff had the severe impairments of depression and anxiety, but did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (Id.) The ALJ found that plaintiff was unable to perform her past relevant work as a mail clerk, inasmuch as that work required her to deliver mail and thus interact with the public. (Tr. 20). However, the ALJ found that plaintiff retained the residual functional capacity ("RFC") to perform work requiring her to understand, remember and carry out at least simple instructions and non-detailed tasks, provided that work involved a low-stress environment without public contact. (Tr. 13). In so finding, the ALJ noted, inter alia, that plaintiff's lowest GAF score in the preceding year was 40, assessed

on April 4, 2007; and that her highest, and most current, GAF was 55. (Tr. 18). Having cited <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1321-22 (8th Cir. 1984), and having noted all of the relevant factors therefrom, the ALJ discredited plaintiff's allegations symptoms precluding all work. (Tr. 13-20).

Regarding his communication with Dr. Berland, the ALJ wrote as follows:

> On May 15, 2007, the undersigned sent a letter to Dr. Berland requesting clarification of his statement as it contained conflicts that could not be reconciled with the medical evidence of record including the Global Assessment of Functioning scores he assigned the claimant; it did not contain all the necessary information needed to assess the severity of the impairment(s); it was not based upon medically acceptable clinical and laboratory diagnostic techniques and it did not adequately address what the claimant could do in spite of the impairment. (citations omitted). On May 17, 2007, Dr. Berland responded that he had sent all the information in his chart to Nancy Mogab, attorney, (citation omitted). He had no other documentation regarding the claimant.

(Tr. 18).

The ALJ concluded that, considering plaintiff's age, education, work experience, and residual functional capacity, and considering the VE's testimony, the ALJ determined that plaintiff could perform other jobs such as mail clerk and laundry bagger, jobs that existed in substantial numbers in the national economy. (Tr. 21). The ALJ concluded that plaintiff had not been under a disability, as defined by the Social Security Act ("Act"), at any

time through the date of his decision.  (Tr. 22).

## IV.  Discussion

To be eligible for benefits under the Social Security Act, plaintiff must prove that she is disabled.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Services</u>, 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace.  <u>See</u> 42 U.S.C. §§ 423(d)(1)(A) (defining "disability" for DIB purposes).  The Act provides disability benefits only to those unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  <u>Id.</u> It further specifies that a person must be both unable to do her previous work and unable, "considering [her] age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work."  42 U.S.C. §§ 423(d)(2)(A); <u>see also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); <u>Heckler v. Campbell</u>, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process. <u>See</u> 20 C.F.R. §§ 404.1520; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then she is not disabled. If the claimant's impairment is severe, the Commissioner then determines whether it meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his or her past relevant work. If so, the claimant is not disabled. If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. <u>Pearsall</u>, 274 F.3d at 1217, <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Young</u>

o/b/o Trice v. Shalala, 52 F.3d 200 (8th Cir. 1995), citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion. Briggs v. Callahan, 139 F.3d 606, 608 (8th Cir. 1998). To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ;

2. The plaintiff's vocational factors;

3. The medical evidence from treating and consulting physicians;

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5. Any corroboration by third parties of the plaintiff's impairments;

6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.

Stewart v. Secretary of Health & Human Services, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." Groeper v. Sullivan, 932 F.2d 1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608.

However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003) (citing <u>Davis v. Apfel</u>, 239 F.3d 962, 966 (8th Cir. 2001)).

In the case at bar, plaintiff advances several arguments in support of the conclusion that the ALJ's RFC and credibility determinations are not supported by substantial evidence on the record as a whole. Plaintiff also contends that the ALJ failed to consider her impairments in combination; erroneously discredited Dr. Berland's findings and opinions; and erred in the hypothetical questions he posed to the VE. Plaintiff also contends that her due process rights were violated when the ALJ re-contacted Dr. Berland without her knowledge, and argues that certain arguments the Commissioner presents in support of the ALJ's decision erroneously rely on facts not found in the ALJ's decision. In response, the Commissioner contends that the ALJ's decision is supported by substantial evidence on the record as a whole, and also contends that there was no due process violation because the ALJ received no new evidence from Dr. Berland in response to his May 15, 2007 written inquiry. Review of the record reveals that there is no error in relying upon the facts cited by the Commissioner in support of the ALJ's decision, and the Commissioner's arguments are well-taken.

A.   <u>Due Process</u>

As noted above, in a supplemental response to the Commissioner's Brief in Support of the Answer, plaintiff alleges that her due process rights were violated when ALJ Schum wrote to Dr. Berland following the hearing without plaintiff's knowledge. In support of her argument, plaintiff alleges that ALJ Schum relied upon Dr. Berland's response in his decision to discredit plaintiff, and directs the Court's attention to its recent decision in Obermoeller v. Astrue, 2008 WL 4279616 (E.D. Mo. 2008). In response, the Commissioner contends that there was no denial of due process because the ALJ received no new evidence in response to his inquiry.

In Obermoeller, on the day before the claimant's administrative hearing, the ALJ[23] wrote a letter to a Dr. Khawla Khan, soliciting additional information to clarify her earlier report regarding the claimant. Id. at *12. The ALJ did not notify the claimant or his attorney that he had written the letter; did not copy claimant or his attorney on the letter; and failed to make the letter a part of the administrative record. See Id. In a letter dated after the hearing, Dr. Khan responded, setting forth her opinion regarding the extent to which the claimant was limited by his physical and mental impairments. Id. at *13. Although this letter was made a part of the administrative record, neither the claimant nor his attorney received a copy of this letter prior to

_____

[23]The ALJ in this case, ALJ Schum, also served as the ALJ in Obermoeller.

the ALJ's written opinion.  Furthermore, in his decision, the ALJ set forth the contents of Dr. Khan's post-hearing letter, and relied on those contents to discredit Dr. Khan's opinion. <u>Obermoeller</u>, 2008 WL 4279616 at *13.  This Court remanded, finding that, in the absence of any notice to the claimant of the post-hearing evidence received from Dr. Khan, evidence upon which the ALJ relied, in part, to deny benefits, it could not be said that due process requirements were satisfied.  <u>Id.</u>

In contrast, in the case at bar, Dr. Berland's post-hearing letter supplied no new evidence in response to ALJ Schum's inquiry, and formed no basis for the ALJ's decision.  Instead, Dr. Berland advised that he had no further evidence, and indicated that he had already sent all of the information he had to offer to plaintiff's counsel.[24]  (Tr. 18, 617).  In addition, it does not appear that Dr. Berland's post-hearing letter played any role whatsoever in either the ALJ's decision to discredit Dr. Berland's opinion, or in the ALJ's decision to deny plaintiff's application.  As noted above, the only reference to Dr. Berland's post-hearing letter in the ALJ's decision was a notation that further evidence had been solicited, but that Dr. Berland had replied that he had none to offer.  (Tr. 18).

Because Dr. Berland's post-hearing letter did not supply any evidence that was not already in the record, and because the

---

[24]Dr. Berland also sent plaintiff's attorney a copy of the post-hearing letter he sent to the ALJ.  <u>See</u> (Tr. 617).

ALJ did not rely upon Dr. Berland's post-hearing letter in his decision to discredit Dr. Berland's findings and opinions and to deny plaintiff's application, it cannot be said that a due process violation exists.  See Heisner v. Secretary of Health, Education and Welfare, 538 F.2d 1329, 1331 (8th Cir. 1976) (the lack of counsel will not affect the validity of a hearing before an ALJ unless the claimant demonstrates prejudice or unfairness in the hearing); see also Kelley v. Heckler, 761 F.2d 1538, 1540 (11th Cir. 1985) (the claimant must make a showing of prejudice in order for the court to find that his due process rights were violated and remand the cause to the Commissioner); see also Jackson v. Astrue, 2009 WL 4893207, 6 (N.D. Fla 2009) (absent a showing of prejudice, such as a failure to fully develop the record, plaintiff's argument that he was denied due process failed).  The ALJ's post-hearing correspondence with Dr. Berland is therefore not grounds for reversal.

B.   Credibility Determination

In the case at bar, after citing the Polaski decision and listing all of the relevant factors, the ALJ in this case discredited plaintiff's allegations of symptoms precluding all work, noting several factors from the record detracting from plaintiff's credibility.  Plaintiff alleges that the ALJ's credibility findings are not supported by substantial evidence on the record as a whole, inasmuch as the ALJ noted Dr. Brown's

observation of symptom magnification, even though Dr. Brown opined that plaintiff required surgery, and ultimately performed such surgery, and plaintiff received a workers' compensation settlement related to her right elbow and left shoulder. Plaintiff also alleges that the ALJ discredited plaintiff's allegations of breathing difficulties because of evidence of non-compliance and smoking, but failed to note Dr. Aisenstat's treatment history, and failed to ask plaintiff about her smoking during the hearing. Plaintiff also challenges the ALJ's consideration of the fact that plaintiff traveled. Review of the record, however, reveals that the ALJ properly considered all of the evidence of record, and that substantial evidence supports his credibility determination.

Before determining the claimant's residual functional capacity, the ALJ must evaluate the credibility of the claimant's subjective complaints. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citing Pearsall, 274 F.3d at 1217.) Testimony regarding pain is necessarily subjective in nature, as it is the claimant's own perception of the effects of her alleged physical impairment. Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993). Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. Polaski at 1321-22. In Polaski, the Eighth Circuit addressed this difficulty and established the following standard for the evaluation of subjective complaints:

The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions.

Id. at 1322.

Although the ALJ is not free to accept or reject the claimant's subjective complaints based upon personal observations alone, he may discount such complaints if there are inconsistencies in the evidence as a whole. Id. The "crucial question" is not whether the claimant experiences symptoms, but whether her credible subjective complaints prevent her from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). When an ALJ explicitly considers the Polaski factors and discredits a claimant's complaints for a good reason, that decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The credibility of a claimant's subjective testimony is primarily for the ALJ, not the courts, to decide, and the court considers with deference the ALJ's decision on the subject. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

In assessing plaintiff's credibility, the ALJ in this

case cited the <u>Polaski</u> decision, and listed all of the relevant factors therefrom. The ALJ then noted several inconsistencies in the record detracting from plaintiff's credibility. The ALJ noted that there was no medical evidence, including pulmonary function studies, documenting a severe breathing impairment; no evidence of severe or frequent asthmatic attacks requiring emergency treatment; no evidence of significant loss of pulmonary capacity or inability of the lungs to oxygenate the blood; and no medical records documenting any objective findings of signs and symptoms of chronic obstructive pulmonary disease. The ALJ also noted that there was no evidence that plaintiff required hospitalization for any breathing difficulty. In addition, the ALJ noted that the record did not contain evidence that plaintiff's upper extremity conditions were limiting for the requisite time period, and also noted that there was no objective medical evidence, such as muscle atrophy or spasm, that plaintiff's alleged back impairment imposed any limitations on her ability to work. Specifically, the ALJ wrote, "[a] person purportedly so inactive that they could not even engage in sedentary work activity for a period of over three years would be expected to have objective findings of atrophy." (Tr. 15). While the lack of objective medical evidence is not dispositive, it is an important factor, and the ALJ is entitled to consider the fact that there is no objective medical evidence to support the degree of alleged limitations. 20 C.F.R. §§ 404.1529(c)(2); <u>Kisling v. Chater</u>, 105 F.3d 1255, 1257-58 (8th Cir.

1997); <u>Cruse</u>, 867 F.2d at 1186 (the lack of objective medical evidence to support the degree of severity of alleged pain is a factor to be considered); <u>Battles v. Sullivan</u>, 902 F.2d 657, 659 (8th Cir. 1990)(ALJ properly denied benefits to claimant who had no medical evidence indicating a serious impairment during the relevant time); <u>Johnson v. Chater</u>, 87 F.3d 1015, 1017-18 (8th Cir. 1996) (it is proper for an ALJ to consider the lack of reliable medical opinions to support a claimant's allegations of a totally disabling condition; in fact, this was noted to be the "strongest support" in the record for the ALJ's determination).

The ALJ also noted that plaintiff understood when she needed to use her inhaler, and that her breathing difficulty was not a significant impairment when inhalers were used. If an impairment can be controlled with medication, it cannot be considered disabling. <u>Patrick v. Barnhart</u>, 323 F.3d 592, 596 (8th Cir.2003) (holding if an impairment can be controlled by treatment or medication, it cannot be considered disabling). In addition, the undersigned notes that the medical evidence indicates that plaintiff worked consistently for a number of years while simultaneously seeking treatment for the same breathing problems she now alleges are disabling, and there is no evidence in the record that her breathing problems have worsened since then. In fact, in September of 2002, well before plaintiff stopped working, she saw Dr. Aisenstat and complained of severe coughing and rib pain, and Dr. Aisenstat noted that plaintiff had sustained a rib

fracture. (Tr. 419). Impairments which were present during working years, and have not worsened, cannot be used to prove present disability. Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994) (citation omitted).

The ALJ also noted that plaintiff's demeanor during the hearing was inconsistent with her reported physical and mental impairments. The ALJ noted that plaintiff was able to respond to questions in a clear and logical manner, with no outward signs that would be associated with one suffering from a severe mental impairment or physical distress. An ALJ's personal observation of a claimant at the hearing is an appropriate factor to consider in assessing the validity of a claim of mental retardation/disability, see Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998), and pain precluding all work, see Long v. Bowen, 866 F.2d 1066, 1067 (8th Cir. 1989) (observations that claimant demonstrated no evidence of impairment during hearing included as one of legally sufficient reasons).

The ALJ also noted that plaintiff used only over-the-counter medications for her arm and back pain. Over-the-counter medications are inconsistent with complaints of disabling pain. Loving v. Department of Health and Human Services, Secretary, 16 F.3d 967, 971 (8th Cir. 1994). The ALJ also noted that the medical records did not document that any treating physician ever found or imposed any long term, significant and adverse mental or physical limitations upon plaintiff's functional capacity. The ALJ also

noted that, in February of 2004, it was opined that plaintiff could work with a five-pound lifting restriction, and in October 2004, plaintiff was returned to work full-duty with no restrictions. The absence of functional restrictions placed on claimant's activities is inconsistent with a claim of disability. Hensley v. Barnhart, 352 F.3d 353, 357 (8th Cir. 2003); see also Brown v. Chater, 87 F.3d 963, 964-65 (8th Cir. 1996) (lack of significant restrictions imposed by treating physicians supported ALJ's decision that claimant was not disabled). The ALJ also noted that, although plaintiff alleged disability due to brain damage, anxiety, depression, memory problems, back and arm pain, asthma, migraines and her left shoulder, there was no medical evidence that plaintiff ever required prolonged hospitalizations since her alleged onset date. As noted above, an ALJ may properly consider the lack of medical evidence indicating a serious impairment as detracting from plaintiff's allegations of disability. See Battles, 902 F.2d at 659 (ALJ properly denied benefits to claimant who had no medical evidence indicating a serious impairment during the relevant time). The ALJ concluded that plaintiff's allegations of symptoms precluding all work were inconsistent with the evidence as a whole, and were not credible. Because the credibility findings are supported by multiple valid reasons, they are entitled to deference. See Goff v. Barnhart, 421 F.3d 785, 791-92 (8th Cir. 2005).

Plaintiff contends that the ALJ improperly noted Dr.

Brown's impression of symptom magnification while ignoring the fact that Dr. Brown had opined that plaintiff required surgery, and had later performed such surgery. However, review of the ALJ's decision reveals that he conducted an exhaustive review of Dr. Brown's records, including his diagnosis of plaintiff's epicondylitis that had failed to respond to conservative treatment, and plaintiff's subsequent surgery. (Tr. 16). The ALJ continued, noting plaintiff's post-surgical follow-up with Dr. Brown, noting that she had good active range of motion, and that no further treatment was necessary, and that she was released to return to work full duty, with no restrictions. (Id.) The ALJ further noted that there was no indication that plaintiff had an upper extremity impairment that lasted for more than twelve consecutive months. (Id.) The ALJ noted that, while plaintiff was given a five-pound weight restriction in February of 2004, she was returned to work full-duty in October of 2004, less than twelve consecutive months later. (Id.) The ALJ also noted that the record contained no evidence that plaintiff had any further treatment of her left arm. (Tr. 16).

The fact that the ALJ considered Dr. Brown's observation that plaintiff exaggerated her symptoms does not mean, as plaintiff suggests, that the ALJ "ignored" the fact that Dr. Brown had previously diagnosed plaintiff with epicondylitis, or that he later performed surgery. An ALJ is entitled to consider the fact that a claimant may be exaggerating her symptoms. O'Donnell v. Barnhart,

-45-

318 F.3d 811, 818 (8th Cir. 2003)(ALJ may discount a claimant's allegations if there is evidence that claimant is a malingerer or was exaggerating symptoms for financial gain.) Moreover, the undersigned notes that the record supports the ALJ's observation. On February 18, 2003, after examining plaintiff, Dr. Brown concluded that plaintiff was exaggerating her symptoms after noting that her subjective complaints had suddenly expanded; were diffuse and non-physiologic; did not correspond with her diagnosis; and that plaintiff exhibited poor effort during examination. (Tr. 629). Dr. Brown offered several good reasons for concluding that plaintiff was exaggerating her symptoms on that occasion, and the fact that he later performed surgery does not mean that his findings of symptom exaggeration were unreliable. Nor does plaintiff's later surgery mean that the ALJ was precluded from considering credible, well-supported evidence in the record that plaintiff had, on that occasion, exaggerated her symptoms. Furthermore, the undersigned notes that, when plaintiff presented for the visit with Dr. Brown during which Dr. Brown noted evidence of symptom magnification, Dr. Brown noted that he had arranged for plaintiff to come in to be seen because she had contacted his office and stated that she was unable to work. (Tr. 628). During the visit, plaintiff and Dr. Brown had a long discussion regarding the duties involved in certain jobs available at her place of employment, and plaintiff denied being able to perform any of them with the exception of a job involving removing faxes from the fax

machine. (Tr. 628-29).

Plaintiff next contends that the ALJ erroneously considered plaintiff's smoking history in discrediting her complaints of disabling breathing problems. The undersigned disagrees. In discrediting plaintiff's allegations of a disabling breathing impairment, the ALJ noted, <u>inter</u> <u>alia</u>, that the medical evidence of record indicated that plaintiff smoked cigarettes despite being advised to stop. Specifically, the ALJ wrote:

> The medical record is replete with documentation of non-compliance on the part of the claimant with regard to smoking. The undersigned finds it inconsistent that an individual, if truly desirous of work would repeatedly fail to comply with prescribed treatment for ailments which she feels are significantly limiting her functional capacity. it is reasonable than an individual would attempt to comply with prescribed treatments which are intended to alleviate allegedly severe symptoms.

(Tr. 17).

Plaintiff directs the Court's attention to page 588 of the administrative transcript, wherein Dr. Berland noted that plaintiff had "quit then resumed smoking last week, patient resumed because of stress." (Docket No. 15 at 13). In noting this observation by Dr. Berland, plaintiff suggests that she "must have complied with Dr. Aisenstat's recommendation to stop smoking." (<u>Id.</u>) Plaintiff does not argue that she had actually quit smoking at the time of the hearing; she merely suggests that it is apparent that she "must have" stopped smoking as recommended by Dr.

-47-

Aisenstat. Dr. Berland's observation is unhelpful to plaintiff. It does not support the conclusion that plaintiff indeed quit smoking as recommended by Dr. Aisenstat; in fact, it supports the opposite conclusion: that plaintiff was still smoking cigarettes at the time Dr. Berland made his observation. The ALJ was entitled to consider the evidence from the record indicating that, during the time related to plaintiff's application, she smoked cigarettes despite medical advice. Kisling, 105 F.3d at 1257 (An ALJ may properly consider a claimant's failure to quit smoking as a factor detracting from credibility).

Plaintiff also contends that the ALJ's credibility findings are in error because, although he considered plaintiff's smoking history in discrediting her, he did not question her about smoking during the hearing. Indeed, before an ALJ denies benefits due to a claimant's failure to heed medical advice and quit smoking, the ALJ must inquire into the circumstances surrounding the failure, and determine, based on the evidence of record, whether quitting smoking would restore the claimant's ability to work, or sufficiently improve his condition. Burnside v. Apfel, 223 F.3d 840, 844 (8th Cir. 2000)(citations omitted).

In the case at bar, however, the evidence in the record that plaintiff continued to smoke was not the only reason the ALJ gave for discrediting plaintiff's allegations of breathing problems precluding all work. Therefore, even if it could be said that the ALJ erred by considering plaintiff's smoking history without first

-48-

soliciting hearing testimony, any error would be harmless, inasmuch as it would not have changed the ALJ's decision. See Brueggemann v. Barnhart, 348 F.3d 689, 695-96 (8th Cir. 2003)(applying harmless error analysis; noting standard is "whether the ALJ would have reached the same decision denying benefits" even absent the error).

Plaintiff also alleges error in the ALJ's finding that plaintiff's travel history detracted from her credibility. In his decision, the ALJ noted that plaintiff had, on three or four occasions, taken her younger daughter to California in order for her to "reach a dream," and had also traveled to Arkansas. (Tr. 19). The ALJ then wrote "[t]he claimant's travels are not supportive of the allegations of disabling symptoms." (Id.) Citing no authority, plaintiff alleges that the ALJ's statement was "vague," and did not "address which symptoms he felt would prevent her from traveling, nor that she was advised that she should not travel." (Docket No. 15 at 13-14).

Plaintiff's argument is unavailing. In her application and during her hearing, plaintiff alleged a multitude of symptoms that she felt precluded her from engaging in any work, and testified that her impairments rendered her practically bedridden; that she did no household activities; she did not dress every day; she could not read; she did not watch TV; and that she wanted only to stay alone in her room. The fact that the ALJ did not specifically enumerate which symptoms would preclude travel does not defeat his credibility determination. Plaintiff's willingness

-49-

and ability to travel halfway across the country on multiple occasions is inconsistent with her testimony concerning her daily activities, and her allegations of debilitating symptoms precluding all work.  Plaintiff's travel was an appropriate factor to weigh in assessing plaintiff's credibility.

Plaintiff also suggests that the ALJ improperly discredited plaintiff's allegations of an inability to work due to mental problems.  However, the ALJ noted that, despite plaintiff's allegation of brain damage and mental retardation, evidence in the record indicated otherwise.  The ALJ noted the four-page "New Patient Questionnaire" plaintiff completed for Dr. Brown on January 21, 2004, noting that plaintiff described her job in detail, naming several job duties that included working on the computer for several hours per day and filing for two to three hours.  (Tr. 19, 637-40).  Consistent with the ALJ's findings, the undersigned notes that the questionnaire solicited a great deal of information (including plaintiff's health history, current medications, family medical history, and history of her present injury) and that plaintiff responded to every question.  See (Id.) Specifically, in the section labeled "Traumatic Injury," plaintiff was asked whether she had experienced "a specific traumatic injury to [her] extremity that caused [her] problem," and was also asked to provide the injury date.  (Tr. 639).  Plaintiff responded to each question fully.  (Id.) Plaintiff was then asked to "describe what happened, and specifically what happened to [her] injured extremity," and

plaintiff wrote: "Was pushing a banker box weight about 50 or 60 lbs made it turn around a corner and herd a pop and had pain in my elbow and down my arm and into my thum and two fingers." [sic] (Id.) Later in the questionnaire, plaintiff responded to a question asking her to "describe [her] job in detail" by writing:

> Pushing banker boxes 50 or 60 could be up to 70 lbs and I also was lifting them I have done around 32 books I did the last one I pushed In the room that on was when I heard the pop One time a year boxing all the folders out of filing cabnet and put them in the banker boxes then put boxes in other room and stake the boxes on top of each other depending on were they have to go I work on the computer 3 to 5 hours a day and fileing each day around 2 or 3 hours I also alphabites all paperwork to file for all compaines mail take me around 1 ½ hours a day and if UPS or pilot is bast on how mine package I need to box up to send out. [sic]

(Tr. 640).

While plaintiff's handwritten written responses contain spelling and punctuation errors, they nevertheless demonstrate that plaintiff was able to read and comprehend questions containing words such as "traumatic," "extremity," and "specific," and was also able to provide copious, legible responses that communicated a great deal of information concerning her numerous job duties and how she was injured on the job. This is inconsistent with plaintiff's testimony that she was unable to read, (Tr. 49), and that physicians at Missouri Baptist Hospital had to give plaintiff physical therapy exercise instructions in picture form due to her inability to read. (Tr. 43).

-51-

Plaintiff also suggests that the ALJ erroneously failed to consider that she received a workers' compensation settlement for her upper extremities. As noted above, the record does contain evidence that plaintiff received such a settlement; however, plaintiff does not cite, nor is the undersigned aware, of any authority mandating the Commissioner to consider workers' compensation settlements in evaluating credibility, or, for that matter, RFC. Furthermore, the decision of the Division of Workers' Compensation is not binding upon the Social Security Administration, and it cannot be said that the ALJ erred by failing to consider plaintiff's workers' compensation settlement in this case.

A review of the ALJ's credibility determination shows that, in a manner consistent with and required by <u>Polaski</u>, he considered plaintiff's subjective complaints on the basis of the entire record before him, and set forth numerous inconsistencies detracting from plaintiff's credibility. An ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. <u>Battles</u>, 902 F.2d at 660. Because the ALJ considered the <u>Polaski</u> factors and discredited plaintiff's subjective complaints for a good reason, that decision should be upheld. <u>Hogan</u>, 239 F.3d at 962.

C.  <u>RFC Determination</u>

Plaintiff also challenges the ALJ's RFC determination.

Specifically, plaintiff argues that the ALJ failed to consider the evidence of her migraine headaches, attributing this failure to the fact that the ALJ ignored the records of Drs. Aisenstat and Dr. Berland.

Residual functional capacity is defined as that which a person remains able to do despite her limitations. 20 C.F.R. § 404.1545(a), Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. 20 C.F.R. § 404.1545(a); Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff, 421 F.3d at 793.

A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination. Id.; Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer, 245 F.3d at 703-04; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Hutsell, 259 F.3d at 712. However, although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217 (8th Cir. 2001); McKinney, 228 F.3d at

863.  The claimant bears the burden of establishing her RFC.  <u>Goff</u>,
421 F.3d at 790.

Plaintiff contends that the ALJ erred in finding that
plaintiff's headaches were not a severe impairment.  A severe
impairment is an impairment, or combination of impairments, which
significantly limits a claimant's physical or mental ability to
perform basic work activities without regard to age, education, or
work experience.  20 C.F.R. 404.1520(c); 404.1521(a).  The
impairment "must result from anatomical, physiological, or
psychological abnormalities which can be shown by medically
acceptable clinical and laboratory diagnostic techniques.  A
physical or mental impairment must be established by medical
evidence consisting of signs, symptoms, and laboratory findings,
not only by [the claimant's] statement of symptoms."  20 C.F.R.
404.1508.

In the case at bar, the ALJ noted that, while the record
established that plaintiff sought treatment for headaches, and that
migraines had been diagnosed, there were no records of abnormal
radiological studies or vascular or neurological abnormalities, nor
were there records of neurological examinations having been
performed.  (Tr. 17).  The ALJ noted that the record did not
document findings by a treating physician of any limitations,
lasting twelve consecutive months, despite treatment and due to
migraines.  (<u>Id.</u>)  The ALJ also noted that plaintiff told Dr.
Berland that Elavil helped her migraines, and that she reported no

migraines during a subsequent visit with him.  If an impairment can be controlled by treatment or medication, it cannot be considered disabling.  Patrick, 323 F.3d at 596.  The ALJ concluded that the record was inconsistent with allegations of a severe impairment that imposed significant limitations of function for twelve consecutive months.  (Id.)  The disability, and not only the impairment, must have lasted or be expected to last for twelve months.  Barnhart v. Walton, 535 U.S. 212 (2002).

This finding is supported by the record.  The record contains little evidence confirming the headache severity and frequency plaintiff alleges.  The record reveals no emergency room treatment, nor, as the ALJ noted, does the record contain evidence of diagnostic testing, which may reasonably be expected if plaintiff were experiencing migraine headaches of the alarming frequency and severity she alleges.  Furthermore, as the Commissioner correctly notes, the record establishes that plaintiff worked for a number of years while simultaneously seeking regular treatment for migraine headaches, and there is no medical evidence in the record that her headaches have worsened.  A condition that was not disabling during working years and has not worsened cannot be used to prove present disability.  Naber, 22 F.3d at 189. Finally, while the ALJ noted one instance in which plaintiff indicated that her headaches responded to medication, the undersigned notes that other medical records, which the ALJ indicated that he had reviewed, contain many such observations.  As

the ALJ noted, in May of 2005, plaintiff told Dr. Berland that Elavil was helping control her headaches. In addition, in January of 2006, plaintiff told Dr. Berland that Topamax was helping her headaches, and in July of 2006, plaintiff told Dr. Aisenstat that Topamax had been controlling her headaches, and that she experienced a headache when she ran out of Topamax while on vacation and wanted a refill. When an impairment is controlled by medication or treatment, it cannot be considered disabling. Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007).

Plaintiff also alleges that the ALJ failed to consider her impairments in combination. However, as noted above, the ALJ fully summarized all of plaintiff's medical records and separately discussed each of plaintiff's alleged impairments. The ALJ also wrote that plaintiff did not have "an impairment or combination of impairments that [met] or medically [equaled]" any listed impairment. (Tr. 12). Based on the foregoing, the undersigned finds that the ALJ sufficiently considered plaintiff's impairments in combination. See Hajek v. Shalala, 30 F.3d 89, 92 (8th Cir. 1994) (conclusory statement that ALJ did not consider combined effects of impairments was unfounded where ALJ noted each impairment and found that impairments, alone or combined, were not of listing-level severity); see also Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992) (the ALJ sufficiently considered the claimant's impairments in combination by separately discussing the claimant's physical impairments, complaints of pain, and daily

activities).  "To require a more elaborate articulation of the ALJ's thought processes would not be reasonable." <u>Id.</u> (citing <u>Gooch v. Secretary of H.H.S.</u>, 833 F.2d 589, 592 (6th Cir. 1987)).[25]

    D.   <u>Dr. Berland's Opinion</u>

Plaintiff argues that the ALJ provided legally insufficient reasons for rejecting Dr. Berland's opinion. Plaintiff also suggests that the ALJ should have obtained additional psychiatric evaluation if he considered Dr. Berland's report unclear.  Review of the ALJ's decision reveals no error.

A treating physician's opinion is generally entitled to substantial weight, but it does not automatically control, because the ALJ must evaluate the record as a whole.  <u>Davidson v. Astrue</u>, 501 F.3d 987, 990 (8th Cir. 2007) (citing <u>Charles v. Barnhart</u>, 375 F.3d 777, 783 (8th Cir. 2004)).  When an ALJ discounts a treating physician's opinion, he should give "good reasons" for doing so. <u>Davidson</u>, 501 F.3d at 990 (citing <u>Dolph v. Barnhart</u>, 308 F.3d 876, 878 (8th Cir. 2002)).  An ALJ can decline to give controlling weight to a treating physician's opinion that is inconsistent with his or her treatment notes.  <u>See</u> <u>Hacker v. Barnhart</u>, 459 F.3d 934, 937 (8th Cir. 2006). If justified by substantial evidence in the record as a whole, the ALJ can discount the opinion of an examining

---

[25]Although plaintiff does not specifically challenge any other portion of the ALJ's RFC determination, the undersigned has reviewed that determination and found that it is supported by substantial evidence on the record as a whole.

physician or a treating physician.  See Rogers v. Chater, 118 F.3d

600, 602 (8th Cir. 1997); Ward v. Heckler, 786 F.2d 844, 846 (8th

Cir. 1986).

In his decision, the ALJ noted that he was giving "less

weight" to the opinion Dr. Berland expressed in his MSS because it

was not supported by medical evidence.  This finding was proper.

In his treatment notes, Dr. Berland noted memory problems, but

found that plaintiff's concentration appeared intact based on her

ability to perform serial threes with no errors, and her ability to

spell "world" correctly forward and backward.  In addition, Dr.

Berland's records are almost devoid of any medical findings, such

as the results of any mental status examinations, to support the

extreme limitations he noted in his MSS.  When a treating

physician's notes are inconsistent with his opinion, the Court may

decline to give controlling weight to that opinion.  See Hacker,

459 F.3d at 937.  In addition, as the Commissioner correctly

states, the Regulations and Eighth Circuit precedent clearly

require that a medical opinion be well-supported by medical

evidence to be entitled to substantial or controlling weight.  20

C.F.R. § 404.1527(d)(3); Hacker, 459 F.3d 937.

The ALJ also noted that, during the hearing, plaintiff

testified that she did not have individual treatment sessions with

Dr. Berland, but instead took her children with her for group

sessions.  Plaintiff challenges this finding, stating that it is

"incorrect" because Dr. Berland's reports indicated that he saw

plaintiff individually. However, during plaintiff's hearing, she answered "no" when asked whether she had separate sessions with Dr. Berland. (Tr. 31). Plaintiff then explained "[b]ecause when we go in and I take my kids in, and then if I tell him things are happening with my kids and then I tell him - - start telling him how it's affecting me and then he helps my children and then he turns around and then he tries helping me at the same time." (Id.) The ALJ's observation that plaintiff "does not have separate sessions with Dr. Berland" is therefore not "incorrect," as plaintiff contends, but is instead in accord with plaintiff's own hearing testimony. (Tr. 20). In addition, the ALJ did not say that plaintiff had never had a separate session with Dr. Berland and, as discussed above, the lack of separate sessions was not the only reason the ALJ gave for his decision to give less weight to Dr. Berland's opinion. Finally, as the Commissioner correctly notes, the ALJ did not completely discredit Dr. Berland; he only decided to give Dr. Berland's opinion less weight in favor of the opinions of Drs. Aisenstat, plaintiff's long-term treating physicians, and Dr. Brown, who treated plaintiff's arm.

Plaintiff also complains that the ALJ did not state what information Dr. Berland's report lacked. The issue of the ALJ's post-hearing correspondence with Dr. Berland has been addressed, supra. In addition, as discussed above, the ALJ specifically stated that he was giving Dr. Berland's MSS opinion less weight, in favor of the opinions of Drs. Aisenstat, because, inter alia, Dr.

Berland's opinion was unsupported by medical evidence. The ALJ still found that plaintiff could only perform jobs requiring her to understand, remember, and carry out simple instructions and non-detailed tasks; perform in a low-stress environment; and work without public contact. (Tr. 13). As the Commissioner notes, these limitations represent serious functional restrictions, and support the conclusion that the ALJ did not entirely reject Dr. Berland's opinion. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) (The ALJ's finding that plaintiff was limited to sedentary work is itself a significant limitation, and reveals that the ALJ did give some credit to the opinion evidence).

Finally, the undersigned notes that it cannot be said that Dr. Berland's MSS opinion is consistent with the balance of the objective medical information in the administrative record. As noted above, the ALJ in this case conducted an exhaustive review of the medical evidence of record, and made specific factual findings regarding all of the objective medical evidence, noting, inter alia, that none of plaintiff's treating physicians indicated that plaintiff had serious functional restrictions. A treating physician's checkmarks on an MSS form are conclusory opinions that may be discounted if contradicted by other objective medical evidence in the record. See Stormo v. Barnhart, 377 F.3d 801, 805-06 (8th Cir. 2004); Hogan, 239 F.3d at 961.

E.   Scope of Review

In her Response to the Commissioner's brief in support of

-60-

the Answer, plaintiff notes that the Commissioner improperly "suppl[ied] facts missing from the ALJ's decision" in his argument in support of the ALJ's decision. (Docket No. 20 at 1). Specifically, plaintiff argues that the ALJ failed to write that plaintiff worked for a number of years while seeking treatment for migraine headaches; that plaintiff's migraines were controlled by medication; that she had earnings of $4,000.00 posted to her record after her alleged date of onset; and that Dr. Berland's MSS opinion was inconsistent because he had previously found that plaintiff had good concentration and memory. (Docket No. 20 at 2-3). Plaintiff argues that, because the ALJ did not note these facts in his decision, they cannot form a basis for upholding that decision. Citing S.E.C. v. Chenery Corp., 318 U.S. 80 (1943), plaintiff appears to suggest that this Court's consideration of such factors in upholding the ALJ's decision would be to overstep the boundaries established for federal review of administrative decisions. The undersigned disagrees.

As the Eighth Circuit held in HealthEast Bethesda Lutheran Hospital and Rehabilitation Center v. Shalala, 164 F.3d 415 (8th Cir. 1998), a reviewing court may not uphold an agency's decision based upon reasons the agency failed to articulate when "the agency [has] fail[ed] to make a necessary determination of fact or policy" upon which the court's alternative basis is premised. HealthEast, 164 F.3d at 418 (discussing the limitations on the rule dictated in Chenery); Banks v. Massanari, 258 F.3d 820,

824 (8th Cir. 2001). The case at bar, however, does not involve a failure on the part of the Commissioner to make a necessary finding of fact or policy. The ALJ in this case conducted an exhaustive review of all of the medical information of record, and also independently examined each of plaintiff's alleged impairments. Citing Polaski and the relevant factors therefrom, the ALJ properly analyzed plaintiff's credibility, and he noted several inconsistencies in the record supporting his credibility and RFC determinations. Specifically, in so doing, the ALJ noted that plaintiff had sought treatment from the office of Drs. Aisenstat since at least July 1994 (the records documenting her treatment for migraines during her working years); fully discussed Dr. Berland's records; noted that plaintiff reported taking Topamax and Neurontin for her headaches; and noted that she told Dr. Berland that Elavil helped her migraines.[26]

The undersigned therefore concludes that the ALJ made the factual findings necessary for the alternative rationales explained above. See Banks, 258 F.3d at 824 (upholding district court's decision affirming ALJ's decision on an alternative basis not articulated by the ALJ, where ALJ made factual findings necessary for the district court's alternative holding). In addition, a

---

[26]Regarding the Commissioner's argument that plaintiff had post-onset earnings posted to her record, the undersigned notes that, while the ALJ cited this evidence, it did not form a basis for the ALJ's decision, nor does it play any role in this Court's decision.

decision of "less than ideal clarity" should be upheld if the agency's path is reasonably discernible. Mausolf v. Babbitt, 125 F.3d 661, 667 (8th Cir. 1997) (citations omitted). Because the ALJ's decision contained all of the facts necessary for the additional rationales in favor of the ALJ's decision, and because the path the ALJ took in reaching his decision is readily discernible, the general limitation on a reviewing court's ability to use reasons not utilized by the agency is not applicable in this case. Banks, 258 F.3d at 824.


    F.    Vocational Expert Testimony

         Finally, plaintiff argues that the ALJ erred in his hypothetical questions to the VE. In support, plaintiff contends that the ALJ's hypothetical was not a "fair representation of the limitations of Ms. Martise either physically or mentally," (Docket No. 15 at 19), and therefore cannot constitute substantial evidence to support a conclusion of no disability. The undersigned disagrees.

         "A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001) (citing Prosch v. Apfel, 201 F.3d 1010, 1015 (8th Cir. 2000)). An ALJ may omit alleged impairments from a hypothetical question when there is no medical evidence that such impairments impose any restrictions on

the claimant's functional capabilities. <u>Haynes v. Shalala</u>, 26 F.3d 812, 815 (8th Cir. 1994).

As explained, <u>supra</u>, substantial evidence supports the ALJ's RFC and credibility determinations, and the ALJ properly considered and weighed the opinion evidence of Dr. Berland. Likewise, his hypothetical questions included all the impairments he found to be credible. <u>See</u> <u>Strongson v. Barnhart</u>, 361 F.3d 1066, 1072-73 (8th Cir. 2004)(VE's testimony constituted substantial evidence when ALJ based his hypothetical upon a legally sufficient RFC and credibility determination.) It was permissible for the ALJ to exclude "any alleged impairments that [he] has properly rejected as untrue or unsubstantiated." <u>Hunt</u>, 250 F.3d at 625 (citing <u>Long v. Chater</u>, 108 F.3d 185, 187 (8th Cir. 1997)). In addition, as explained above, it was not error for the ALJ to discredit those portions of Dr. Berland's MSS opinion that were inconsistent with his own treatment notes and with other facts in the record; therefore, the ALJ was not required to present those assessments to the vocational expert. <u>See</u> <u>Rogers</u>, 118 F.3d at 602 (finding the ALJ appropriately weighed the treating physician's opinion and the hypothetical question adequately represented the limitations of the claimant).

Therefore, for all of the foregoing reasons, the undersigned determines that the Commissioner's decision is supported by substantial evidence on the record as a whole, and

should therefore be affirmed. Because there is substantial evidence to support the decision, reversal is not required merely because substantial evidence may support a different outcome, or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir.2001); Browning, 958 F.2d at 821.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the Commissioner's decision be affirmed.


The parties are advised that they have until February 25, 2010 to file written objections to this Report and Recommendation. Failure to timely file objections may result in a waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

_Frederick R. Buckles_
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 11th day of February, 2010.